LAW OFFICES OF DALE K. GALIPO
Dale K. Galipo, Esq. (SBN 144074)
dalekgalipo@yahoo.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA  91367
Telephone:   (818) 347-3333
Facsimile:    (818) 347-4118

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL BIANE, | Case No. 2:18-cv-008901 |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | 1. Malicious Prosecution (42 U.S.C. 1983) |
| COUNTY OF SAN BERNARDINO, a municipality; | 2. Retaliation (42 U.S.C. 1983) |
| MICHAEL A. RAMOS, in his individual capacity; | 3. Fabrication Of Evidence (42 U.S.C. 1983) |
| R.LEWIS COPE, in his individual capacity; | 4. Monell Claim (42 U.S.C. 1983) |
| HOLLIS "BUD" RANDLES, in his individual capacity; and | 5. Supervisorial Liability (42 U.S.C. 1983) |
| ROBERT SCHREIBER, in his individual capacity; | 6. Conspiracy (42 U.S.C. 1983) |
| Defendants. | **DEMAND FOR JURY TRIAL** |

COMPLAINT FOR DAMAGES

**COMPLAINT FOR DAMAGES**

1.    Plaintiff PAUL BIANE ("Plaintiff" or "Mr. Biane"), for his complaint against the COUNTY OF SAN BERNARDINO ("County"); MICHAEL A. RAMOS, in his individual capacity, R. LEWIS COPE, in his individual capacity; HOLLIS "BUD" RANDLES, in his individual capacity; and ROBERT SCHREIBER, in his individual capacity, complains and alleges as follows:

**INTRODUCTION**

2.    Paul Biane was the victim of a political vendetta – a criminal investigation and prosecution, lasting nearly a decade, that never should have happened. As a result, Mr. Biane suffered both professionally and personally.

3.    Motivated by personal enmity, political opportunism, and the pursuit of partisan advantages, the Defendants named above aimed to use a criminal investigation and prosecution to punish and humiliate Colonies Partners, L.P. ("Colonies"), which had clashed with the County of San Bernardino over 72 acres of land that the County had wrongfully taken for a regional flood control facility. As part of an effort to portray a 2006 settlement in that controversy as "corrupt" – and to boost their own careers – Defendants targeted then-County Supervisor Paul Biane and others. Mr. Biane was innocent. He was acquitted of all charges in August 2017.

4.    Mr. Biane was never "guilty" of anything other than receiving political donations from his constituents, which he had every right to receive, and voting on a matter of substantial public importance that came before the board. If what Mr. Biane did was "corrupt," then it would be necessary to indict every elected official in the nation.

5.    In 2002, Colonies sued the County seeking compensation for the effective taking of 72 acres of land by Defendant County and the San Bernardino County Flood Control District ("District") for a regional flood control facility. Mr. Biane inherited this controversy when he was elected to the San Bernardino County Board of Supervisors later that year. Mr. Biane, who had the most extensive

-2-

background and understanding of real estate issues on the board, rightly believed that the County was exposed to an extraordinary financial liability if the County did not reach a settlement of the lawsuit. Nevertheless, Mr. Biane worked closely with the County's legal representation to vigorously defend the lawsuit over a period of years, in an effort to give the County the best chances in the litigation. On one occasion, Mr. Biane voted against the settlement when he thought the form of the settlement was not in the County's best interest. Ultimately, Mr. Biane voted in favor of a settlement of the lawsuit in the amount of $102 million in November 2006. As acknowledged by the County itself, this was a reasonable and fair valuation of the settled claims – and in fact, substantially less than the County's total exposure.

6.     Before and after the settlement, Colonies made political contributions to various politicians and organizations. The recipients of donations tended to be pro-development, Republican, and unaffiliated with the clique of politicians who were entrenched in local government. While Mr. Biane's campaigns received donations from Colonies, there was never any secret "quid pro quo" connecting his vote in favor of the settlement with a "bribe." Mr. Biane had every right to vote in favor of or against the proposed settlement, based on whether or not he believed the settlement was in the County's best interest. As an elected politician, Mr. Biane filed all of the legal and appropriate disclosure documents with the County Registrar of Voters and the Secretary of State for the State of California in connection with all of the donations he received.

7.     Following the settlement in the Colonies lawsuit, a faction within San Bernardino politics sought to transmute the affair into a political scandal, implying that the board members had somehow voted in favor of the settlement for corrupt reasons. This campaign developed and manifested in several ways, chief among which was a politically motivated and unfounded criminal investigation of Mr. Burum, Mr. Erwin, and Colonies, which over the years expanded to include Mr.

Biane and Mr. Kirk. This retaliatory and unfounded vendetta ultimately resulted in malicious and false felony charges being brought against Mr. Biane in the case of *People of the State of California v. Paul Biane, et. al.,* case number: FSB-1102102. Mr. Biane was charged with multiple felonies, including conspiracy and bribery. The arrest of Mr. Biane in May 2011 was accompanied by great media fanfare, which was encouraged and whipped up by Defendants.

8.      The vindictive campaign waged by Defendants included meddling in the electoral process. In December of 2010, as a result of this vendetta, Mr. Biane was narrowly defeated for re-election. During the election campaign, his opponent, Janice Rutherford, distributed campaign mailers that emphasized that Mr. Biane was the target of an investigation. While Mr. Biane was being accused of undemocratic activity, it was in fact his political enemies that were using their positions in government to manipulate the outcome of elections.

9.      Mr. Biane was forced to endure years of persecution that began immediately after the settlement in 2006 and continued until 2017, when he was subjected to a 10-month jury trial and acquitted. Throughout the investigation, litigation, and trial, Mr. Biane was the subject of constant media coverage – encouraged by Defendants – that identified him as a "corrupt" politician who had accepted "bribes" – ruining his reputation. However, once the case arrived at trial, it became clear that Mr. Biane was innocent of all of these accusations.

10.      Mr. Biane did not need to call a single defense witness on his behalf when the prosecution had rested its case. After only several hours of deliberation, the jury returned a verdict of not guilty against Mr. Biane. Mr. Biane was completely vindicated with respect to all the charges against him.

11.      This thorough repudiation of the prosecution's case underscores the retaliatory and unjustified motives that drove this retaliatory campaign from the beginning. Simply put, there was never any evidence of criminal conduct involving Mr. Biane – neither before nor after the settlement. Mr. Biane was maliciously and

unfairly investigated, charged, and prosecuted for exercising his rights – indeed, his obligations – including by casting his vote on an issue of substantial importance to the community in his capacity as an elected member of the County Board of Supervisors.

12.     Members of the County Board of Supervisors should be free to vote on any matter that comes before them without fear of retaliation or politically-motivated criminal investigations and prosecutions.

13.     In this manner, and as more fully described below, Defendants violated Mr. Biane's constitutional rights. Mr. Biane brings this action under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

14.     This case arises under 42 U.S.C. 1983. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1331 and 1338. Venue is proper in the Central District of California under 28 U.S.C. 1391 (b) (1) (2), and because the majority of the Defendants reside in this District and substantial acts and omissions giving rise to Mr. Biane's claims occurred in this District.

15.     While Plaintiff brings the claims in this lawsuit under federal law, Plaintiff did present claims pursuant to California Government Code section 810 et. seq. on February 16, 2018. These claims were rejected by the County and the State of California on April 6, 2018 and March 13, 2018, respectively.

## THE PARTIES

16.     Plaintiff Paul Biane is an individual who resides in Rancho Cucamonga, in the County of San Bernardino, in the State of California.

17.     Defendant County of San Bernardino ("County") is a municipal corporation organized and existing under the laws of the State of California. Defendant County was at all relevant times mentioned herein responsible for its own actions and/or omissions as well as the actions and/or omissions and the policies,

-5-

procedures, customs, and practices of the San Bernardino County District Attorney's Office.

18.     At all relevant times, Defendant Michael A. Ramos was the District Attorney of the County of San Bernardino. In that capacity, he was the official responsible for setting and enforcing the policies, customs, and the practices of the District Attorney's Office. Defendant Ramos at all relevant times directed, supervised, authorized, and/or ratified the actions of the office's employees, agents, and officials as alleged herein.

19.     At all relevant times, Defendant R. Lewis Cope was a Deputy District Attorney for the County of San Bernardino in the District Attorney's "Public Integrity Unit" and was a supervisor in that unit. Defendant Cope is employed by and is an agent of Defendant County and the District Attorney's Office at all relevant times herein. Defendant Cope was one of the lead prosecutors from the District Attorney's Office assigned to prosecute Mr. Biane, and as such he directed and participated in the retaliatory criminal investigation of Mr. Biane, including directing, supervising, authorizing, and/or ratifying the actions of the Public Integrity Unit's other employees, agents, and officials working on the investigation and the criminal prosecution of Mr. Biane.

20.     At all relevant times, Defendant Hollis "Bud" Randles was an investigator in the San Bernardino County District Attorney's Office. Defendant Randles was a lead District Attorney investigator in the criminal investigation and criminal prosecution of Mr. Biane.

21.     At all relevant times, Defendant Robert Schreiber was in investigator in the San Bernardino County District Attorney's Office. Defendant Schreiber was a lead District Attorney investigator in the criminal investigation and criminal prosecution of Mr. Biane.

COMPLAINT FOR DAMAGES

22.     In taking the actions alleged herein, the Defendants acted under color of law, and the Defendants conspired with each other and others to engage in the actions described below.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

23.     Prior to being elected to public office, Mr. Biane had a successful 25-year commercial real estate career. Subsequently, he sat on the Rancho Cucamonga City Council for 10 years. In November of 2002, he was elected to the County Board of Supervisors, and took office in early December. Prior to his election, a significant controversy had developed between Colonies and the County, and the parties to this controversy were in the midst of civil litigation.

24.     In 1997, Colonies had purchased 434 acres of land in Upland, California for development. The County and other entities built the 210 Freeway extension through Colonies' property. Accordingly, the County needed a large area in which to contain the substantial water runoff caused by 210 Freeway. The County and the District had attempted to force Colonies to build the flood control facility itself, on Colonies' own land, and at Colonies' expense, rather than exercising the County's power of eminent domain over Colonies' land.

25.     The existing flood control facilities were inadequate to contain up to 80 million gallons of water per hour that could be flooding onto the property. Colonies offered to give the County and the District the necessary acreage if the County and the District would pay for the construction of a basin that would control the new storm waters. The County and the District refused.

26.     The County and the District had taken the position that limited easements from the 1930's allowed them to redirect the massive volume of flood waters created by the construction of the freeway project onto the land of Colonies, and that Colonies was obligated to pay for the required flood control facilities.

27.     Colonies filed a quiet title action in March of 2002 regarding the controversy, which was prior to Mr. Biane taking office. The trial took place in 2003

COMPLAINT FOR DAMAGES

in San Bernardino Superior Court. The trial went against the County. San Bernardino County Superior Court Judge Peter Norell ruled the County and the District did not have the right to dump the flood water onto the land of Colonies without paying fair compensation. The County and the District appealed the decision of Judge Norell, and 3 years later, a second trial was held before the Honorable Christopher Warner in San Bernardino Superior Court.

28.     Years of protracted and costly litigation generated a great deal of bitterness and hostility, not only between sections of the County and Colonies, but also internally within the County administration, where factions formed that were for or against a settlement of the dispute. The position of Mr. Biane was no secret: he believed that the County was in the wrong when it took Colonies' land without just compensation, and that the County should aim for a reasonable settlement. For his political rivals, particularly those within the Office of County Counsel who were afraid a settlement reflect negatively on their performance – for exposing the County to millions of dollars in liability – this was tantamount to treason. At the same time, notwithstanding these internal controversies, Mr. Biane worked hard to make sure that the County was effectively represented in the litigation.

29.     On July 31, 2006, while Mr. Biane was serving on the board, Judge Warner issued a statement of intended decision after 6 weeks of trial. Judge Warner found, inter alia, that: (1) The County and the District's easements did not justify the necessary flood control facilities, and that the County and the District did not have the right to dump any water onto the land of Colonies; (2) That the County and the District had engaged in "deceit" and that they had played "hide the ball" and that they tried to "coerce" Colonies into giving up its rights with regard to its land; (3) That Colonies had taken "every reasonable action to protect the public" even in the face of the County and the District's "deceit and misinformation"; (4) That the County and the District had essentially held Colonies' development "hostage" in order to get free flood control construction and had "unreasonably and unjustifiably

1  interfered with Colonies business"; and (5) That the County and the District had

2  "turned on" the 20th Street Storm Drain in 2002 "without providing for any viable

3  flood-control facilities on [Colonies] property and without ensuring public safety

4  from the flooding hazard."

5         30.    Judge Warner found that the testimony of witnesses for Colonies was

6  more credible than the testimony of County and District witnesses, including Mr.

7  Ken Miller and Mr. Patrick Mead, who were both Directors for the District. Judge

8  Warner's intended rulings constituted a very sharp blow and a profound

9  embarrassment to the County and to the District.

10         31.    The statement of intended decision by Judge Warner, which was

11  reported to Mr. Biane in his capacity as a member of the board, was a critical

12  moment in the legal dispute between Colonies and the County and District. Indeed,

13  Mr. Mitchell Norton, a Deputy County Counsel for the County of San Bernardino,

14  subsequently told investigators that Judge Warner's intended decision was

15  "Armageddon" for the County and for the District. Mr. Norton believed that the

16  County and the District would be facing around $300 million dollars in damages in

17  an inverse condemnation action that had been stayed pending the resolution of the

18  quiet title action if the decision of Judge Warner became final. Significantly, Judge

19  Warner would also have found bad faith by the County and the District, and that

20  finding would have undermined the attempts of the County and the District to obtain

21  indemnification from other government agencies who were involved in the

22  construction of the 210 Freeway.

23         32.    The intended decision by Judge Warner vindicated the position that Mr.

24  Biane had previously taken in favor of settlement. He believed that the controversy

25  – and the positions that the County had been taking prior to his election – had

26  exposed the taxpayers of the County of San Bernardino to a large financial risk.

27

28

COMPLAINT FOR DAMAGES

33.     Mr. Biane exercised his lawful rights as a citizen and member of the board to advocate a settlement of the dispute that he believed would be in the best interest of the County and its taxpayers.

34.     Mr. Biane had an extensive background in commercial real estate, and perhaps more than any other member of the board appreciated the issues involved and the County's potential exposure. Mr. Biane had won election in 2002 based in part on a pro-development constituency and his commitment to pro-development policies. Mr. Biane advocated in favor of settlement in the press, implicitly criticizing the County's past actions, and angering factions within the County.

35.     On November 28, 2006, Mr. Biane voted in favor of a settlement of the Colonies lawsuit for the sum of $102 million, in hopes of ending the contentious and public legal dispute. The vote was 3-2 in favor of the settlement. Supervisors Paul Biane, Gary Ovitt, and Bill Postmus voted in favor of settling the lawsuit; Supervisors Josie Gonzales and Dennis Hansberger voted against settling the lawsuit. Supervisor Josie Gonzales had consistently been in favor of settling the lawsuit. However, she changed her vote and voted against settling the lawsuit.

36.     Mr. Biane had every right to vote in favor of – or against – the settlement, based on whether he believed the settlement was or was not in the County's best interest. Indeed, this was his duty and responsibility as a member of the board. In addition, Mr. Biane believed that entering into the settlement put in the County in the best position to seek indemnification for the settlement amount from other entities, including the San Bernardino Association of Governments (SANBAG) and CalTrans.

37.     Mr. Biane had received campaign donations from Colonies in the past, together with donations from many other constituents. This information was duly reported as required by law and was publicly available. No statute or rule required him to recuse himself from the vote on the Colonies settlement or otherwise prohibited him from casting his vote.

38.     The settlement in the Colonies lawsuit did not end the bitter political feuds raging internally in the County administration. Instead, the settlement only escalated the ferocious factional warfare raging in San Bernardino. The opponents of the settlement sought to whip the settlement into a political scandal, implying that the board members had somehow voted in favor of the settlement for corrupt reasons. Many individuals were stung and incensed by the intended decision by Judge Warner, especially the County Counsel's office and the County Flood Control District staff. In particular, Mr. Biane's factional opponents were anxious to cover up their own role in subjecting the County to such massive liability.

39.     The fact that the County declared its intention of seeking indemnification from other entities was a source of additional bitterness and animosity.

40.     As part of an attempt to generate a scandal for political advantage, the Defendants launched a criminal investigation of Colonies.

41.     In the course of the criminal investigation, Defendants recruited Matt Brown, Mr. Biane's chief of staff, to act as an informant. Matt Brown was instructed to record his conversations with Mr. Biane, to access Mr. Biane's office and documents, and to report on Mr. Biane.

42.     Upon information and belief, Defendants secured Matt Brown's participation in this scheme by means of intimidation, threats, and manipulation. Upon information and belief, information that was provided to Defendants by Matt Brown was leaked by Defendants or their agents to the press, with the goal of destroying Mr. Biane's political career and ensuring the electoral success of his rival. Upon information and belief, Matt Brown was used by Defendants to access to Mr. Biane's confidential and privileged information, with respect to which Defendants would never have been able to obtain lawful authority to conduct a search.

COMPLAINT FOR DAMAGES

43.     Despite functioning as an informant for up to a year, Mr. Brown never learned or communicated to Defendants any information that would incriminate Mr. Biane. Indeed, the recordings and reports by Mr. Brown were so highly exculpatory that Defendants sought to suppress them at trial.

44.     In 2010, Defendant Ramos and then California Attorney General Jerry Brown held a joint press conference to announce the first round of indictments. Mr. Biane was not included in the first round of indictments, evidencing that as even as late as the year 2010, the investigation with respect to Mr. Biane was still in its investigatory, fact-gathering phase. In other words, the 2010 press conference occurred prior to the existence of probable cause as to Mr. Biane.

45.     Mr. Biane was not identified by name in the 2010 press conference, but there were prominent references to "unnamed and uncharged co-conspirators" who included "one member of the Board of Supervisors." In other words, while there were not sufficient grounds to arrest Mr. Biane at that time, he was nevertheless the subject of insinuations and accusations in the press by Defendants. Fielding questions from reporters about the "unnamed" persons, Defendant Ramos went out of his way to disparage Mr. Biane:

> We also know there were two other supervisors that voted for it. I'm not going to talk about who, I'm sure once you read -- again, be patient. When you get these -- this complaint and the overt acts, you will be able to read and you'll see who voted, who did what, and who the John Does were. I mean, it's -- part of it is, we followed the Attorney General's advice and the Federal Rules of Court in not naming names for those that were uncharged. But, I think it's fairly obvious, when you read through the overt acts, who we're talking about.

Ramos stated: "I'm here to tell you, I was elected by these citizens to finish the job of this corrupt – and these corrupt individuals (sic)," referring to Mr. Biane.

46.     Ramos, perhaps protesting too much, emphatically insisted that the prosecution was not politically motivated: "there's no political, there's nothing political involved, it's all about people who are committing crimes, and wanting to hold these people responsible (sic)."

47.     In other words, before Mr. Biane (who after all enjoyed at all times the presumption of innocence) had even been arrested or charged with any crime, and prior to the existence of probable cause as to Mr. Biane, Defendant Ramos went before the TV cameras to proclaim that Mr. Biane was one of a number of "people who are committing crimes." These unfounded accusations and public remarks were designed to and did result in substantial damage to Mr. Biane's reputation as a public figure.



48.     Defendant Ramos held another press conference in 2011 to announce the indictment of additional defendants, including Mr. Biane. During this conference, he stated: "I will also note for the record this morning that Paul Biane we consider to be a fugitive at this time." A "wanted" flyer was issued featuring a sheriff's badge and Mr. Biane's picture together with the words "WANTED" and "Active Felony Warrant" in large red type. In response to a reporter's question, Defendant Ramos claimed that there was a "team out looking" for Mr. Biane.

49.     At the time of the 2011 press conference, Mr. Biane was on a business trip to Arizona. He promptly traveled back to California to turn himself in. He was never a "fugitive." The "wanted" poster and "fugitive" description were gratuitous and unnecessary, further underscoring the vindictive effort to destroy Mr. Biane's name and reputation. There was never any indication that Mr. Biane intended to flee or evade arrest. Defendant Ramos also told reporters that bail was fixed at $2

million for Mr. Biane. Reporters were provided with "packets" of information detailing the accusations.

50.     At the time of the press conference, the Defendants had been informed by Mr. Biane's counsel where he was and that he had made arrangements to travel back to California as soon as possible, further underscoring the gratuitous and unnecessary character of the "wanted" flyer. Upon information and belief, the Defendants then informed the press of where and when Mr. Biane's plane would land, to ensure that numerous television channels were present at the airport to film his arrival. Defendants' actions were calculated to generate a sensational (and fictitious) story concerning Mr. Biane in the press.

51.     When Mr. Biane landed, he was subjected to an outrageous ordeal, with television cameras arrayed to film his arrest at the airport. This "perp walk," facilitated and encouraged by Defendants, was designed to destroy Mr. Biane's reputation, humiliate him in front of the broadest possible audience, and undermine his right to a fair trial.

52.     During the 2011 press conference, Defendant Ramos referred to the prosecution team as "Team Justice." Defendant Ramos named Defendant Cope, Defendant Randles, Defendant Schreiber, and others as members of "Team Justice."

53.     At the 2011 press conference, Defendant Ramos praised himself and his own role in the investigation, touting "determination, courage," and "committed resources by this office and our state and federal partners" for the success of the investigation. The press conference then developed into a sort of campaign speech by Defendant Ramos, in which he boasted: "I said to the citizens in 2003 . . . that we are not going to tolerate corruption in San Bernardino County. When we raise our right hand to take our solemn oath, that's what we mean. We are going to do what's right for the citizens. We are going to abide by the state constitution, by the federal constitution. And it always hits me strong at the end, when we talk about that, that we will do our job to the best of our ability . . These individuals have violated that

trust of the citizens of this County." He continued: "We will not tolerate corruption. We will put an end to corruption in San Bernardino County." He went on to state: "This is a historical day. . . . We are not going to back down. I've made that commitment before. We are going to continue going forward with our investigation." He promised the "taxpayers" of San Bernardino County that he would recover the $102 million that was "stolen" by the individuals being arrested.

54.     Mr. Biane, as the jury in his criminal case would later affirm, was innocent of all of these hyperbolic and inflammatory accusations. Mr. Biane had done nothing that would constitute failure to "abide by the state constitution" or "by the federal constitution." He had not violated any "solemn oath" that he had sworn. He did not "violate the trust" of the community. This was a gratuitous public attack by Defendant Ramos that was designed to destroy the reputations and careers of Mr. Biane and others.

55.     The primary targets of the Defendants' campaign were Colonies, Mr. Burum, and Mr. Erwin. In order to reach these targets, Defendants determined that they would have to establish that the votes in favor of the settlement were somehow "corrupt." Accordingly, Defendants set out to establish that lawful political contributions that had been made subsequent to the settlement were "payoffs" or "bribes." In the end, Mr. Biane believes that he was "collateral damage" in this campaign, since in his case there was zero evidence of any such thing.

56.     To develop a pretext for the criminal investigation of Mr. Biane, the Defendants seized upon a contribution that was not actually made to Mr. Biane and did not benefit Mr. Biane in any way. The accusations against Mr. Biane were based upon a contribution of $100,000 that was in fact initiated by Dan Richards, a Colonies co-managing member, to the San Bernardino County Young Republicans, which was led at the time by Matt Brown and Tim Johnson. This donation was made in 2007, the year following the settlement. Defendants claimed that Mr. Biane was connected to this donation by reason of the fact that Matt Brown was his chief of

staff and Tim Johnson was his field representative. However, neither Mr. Richards, Mr. Brown, nor Mr. Johnson were ever indicted. In other words, none of the parties to this allegedly criminal transaction were targeted. The Defendants never had any evidence or reason to believe that Mr. Biane engaged in wrongful conduct of any kind. Nor was there any evidence that at the time of the vote, Mr. Biane had any reason to expect that such a donation would be made.

57.    Further, the accusations that the settlement was somehow "corrupt" were made immediately after the vote. In other words, Defendants had decided to launch their retaliatory campaign *prior to* the donation to the San Bernardino County Young Republicans that eventually constituted the alleged foundation for the accusations against Mr. Biane.

58.    The Defendants knew, and chose to ignore, (1) the fact that the contribution to the San Bernardino County Young Republicans was lawful, (2) and there was never any evidence of a secret "quid quo pro" connecting this donation with Mr. Biane.

59.    Throughout the investigation, and from the start, Defendants were motivated by political enmity and political opportunism. It is especially significant that Mr. Biane and Defendant Ramos were potential adversaries in an upcoming congressional race. By pressing ahead with the criminal prosecution of Mr. Biane, Defendant Ramos used the powers of his office to remove a rival who was in the way of his political ambitions.

60.    As early as 2006, board member Bill Postmus developed an addiction to methamphetamine, which developed into a public scandal. Defendants sought to leverage Mr. Postmus' condition and the scandal surrounding it for the purposes of the campaign against Colonies and the settlement. In return for overlooking any criminal prosecution he might face in connection with this drug habit and other misconduct – including alleged abuses of his authority in the County Assessor's office – Defendants tried to coerce Mr. Postmus into stating that the board members

who voted in favor of the settlement had received bribes. As a result, Mr. Postmus was pressured to make many highly dubious and disputed statements to investigators in connection with other targets of the investigation. But it is noteworthy that Mr. Postmus never provided any evidence that would incriminate Mr. Biane, who was completely innocent.  Defendant Cope, together with Defendants Randles and Schreiber, directly oversaw the conduct of Mr. Postmus's interviews. In order to help boost the credibility of Mr. Postmus, Defendants were downplayed and cover up his addiction and alleged abuses of authority. This conduct occurred while the investigation was still in its early stages, and before Mr. Biane was a plausible target.

61.    Another motivating factor was Defendant Ramos's personal animosity towards the targets of the criminal investigation. Specifically, Mr. Erwin had made a public allegation on his blog that Defendant Ramos had carried on an extramarital affair. Mr. Erwin had also suggested on his blog that Defendant Ramos had engaged in illicit romantic relationships at City-County Conferences. Mr. Ramos, upon information and belief, was infuriated by these allegations, and desired to retaliate against Mr. Erwin.

62.    In terms of the history of antagonism between the parties, there was also an occasion where Defendant Ramos had engaged in sexually harassing behavior towards three members of Mr. Biane's staff. Defendant Ramos was outraged when Mr. Biane reported this misconduct to County authorities, who investigated. For this and other reasons, Defendant Ramos bore a personal grudge against Mr. Biane.

63.    The Defendants unfairly and maliciously targeted Mr. Biane for these reasons, using his vote in favor of the Colonies settlement as a pretext, and because he happened to be in the path of the vendetta against Colonies and its affiliates.

64.    The Defendants conducted a criminal investigation of Mr. Biane to secure political advantages and to settle private scores. By targeting Colonies, they

were eliminating a source of campaign funds for their rivals. They also sought to distract attention from the County's actual misbehavior toward the Colonies, which had been revealed in the litigation before Judge Warner, and which Mr. Biane had sought to redress by settling the matter.

65.     The malicious character of the criminal investigation was further underscored by the positions taken by the County itself in other litigation, in which the County sought indemnification and other relief from other entities. In other words, while the Defendants conducted an investigation of Mr. Biane and others for "stealing" the settlement funds, the County was simultaneously taking the position in other litigation that the settlement was reasonable.

66.     In a separate lawsuit, taxpayer groups sought to challenge and invalidate the Colonies settlement. This lawsuit ended in dismissal, a decision upheld by the Court of Appeal. No court has ever held that the settlement is not valid and enforceable.

67.     The Defendants, during the course of the criminal investigation, chose to ignore the absence of any evidence that would incriminate Mr. Biane, together with a great deal of exculpatory information.

68.     During the entire course of the criminal investigation and prosecution, no witness ever testified or stated that the donation to the San Bernardino County Young Republicans was made as part of a "quid pro quo" in return for Mr. Biane's vote on the settlement.

69.     The evidence that the Defendants tried to use to incriminate Mr. Biane and others – insofar as it may be called "evidence" at all – consisted of material that any reasonable investigator or prosecutor would have known was false and lacked credibility, in part because the investigators themselves had created the "evidence" in the form of dubious statements they had coerced from Mr. Postmus.

70.     For example, Defendants purported to rely on the testimony of Josie Gonzales. Ms. Gonzales was at all relevant times, and currently still is, a member of

the Board of Supervisors for the County of San Bernardino. Ms. Gonzales had over a long period been in favor of settling the Colonies lawsuit, and she had agreed to the $102-million dollar settlement during the mediation proceedings before the final settlement was reached in November of 2006. Ms. Gonzales switched her vote and voted against the $102-million dollar settlement in November of 2006.

71.    Ms. Gonzales testified at the criminal trial that Mr. Burum had pressured her to vote for the settlement while both she and Mr. Burum were in China at a particular point in time. Unfortunately for the Defendants, Mr. Burum was not in the country of China at the time that Ms. Gonzales testified under oath that he was there. The Defendants presented this false testimony to the grand jury. Defendants ignored plainly exculpatory evidence, to wit, that Mr. Burum's United States Passport showed that he was never in the country of China, and that Mr. Burum's American Express bills, which the Defendants subpoenaed, showed that Mr. Burum was in the City of Palm Springs, California, at the exact same time that Ms. Gonzales testified under oath that he was in China. Notably, Defendants ignored this evidence gathered during the criminal investigation.

72.    Defendants also purported to rely on the testimony of Adam Aleman. Mr. Aleman had reached a deal the Defendants to testify in the criminal case. Mr. Aleman pled guilty to perjury and several other felonies in exchange for his testimony before the grand jury and at trial. Whatever Mr. Aleman might have said about the other targets of the investigation and prosecution, Mr. Aleman did not ever provide any testimony that would incriminate Mr. Biane in particular. As previously noted, not one witness and one not piece of evidence that was presented to the grand jury or at the criminal trial incriminated Mr. Biane in any way.

73.    The fact that "Team Justice" plowed ahead with the investigation and prosecution of Mr. Biane, despite the foregoing absence of incriminating evidence, further underscores the politically motivated character of this campaign. Defendants,

who were members of "Team Justice," integrally participated in this frame-up of Mr. Biane and others.

74.     Upon information and belief, during the period of time when Mr. Brown was functioning as an informant, he retrieved and provided Defendants with confidential and privileged information relating to the real estate activities of Mr. Biane and his family members. These illegal searches were directed at information that was not plausibly related in any way to the investigation. These illegal searches, orchestrated by Defendants, were an attempt to uncover "dirt" on Mr. Biane that could be used to discredit him. Upon information and belief, the material that was obtained in this manner made its way via Defendants into the newspapers, where it was used to try to embarrass and humiliate Mr. Biane.

75.     As noted above, Defendants' campaign included meddling in the electoral process. In 2010, Mr. Biane was narrowly defeated for re-election. During the campaign, his opponent, Janice Rutherford, distributed campaign mailers that emphasized that Mr. Biane was the target of a criminal investigation. With the shadow of this malicious criminal investigation over his head, Mr. Biane was narrowly defeated for re-election.

76.     San Bernardino County Counsel was obligated to provide legal advice to the board, of which Mr. Biane was a member at the time the investigation began. However, County Counsel violated its ethical and professional obligations by conspiring with Defendants against the board, in an effort to reverse the settlement and destroy the careers of those board members who had voted in favor of it. These efforts included disclosing confidential and privileged material to Defendants. Upon information and belief, this conflicted and unprofessional activity was encouraged by the Defendants.

77.     The County Counsel's office refused to provide Mr. Biane with a defense in his criminal case. Accordingly, Mr. Biane was forced to spend large sums of his own resources, including campaign resources as well as personal resources, to

finance his own legal defense. The huge cost of legal representation further contributed to Mr. Biane's defeat in the 2010 elections. As a result of having to pay these costs, he had fewer resources with which to conduct his campaign. In the year 2010, as noted above, the investigation as to Mr. Biane was still in its fact-gathering and investigatory phase.

78.     In the manner described above, the Defendants used their respective powers as public servants, under color of law, to carry out a vendetta and destroy Mr. Biane's career and reputation. Mr. Biane contends that this conduct caused substantial and lasting harm and violated his constitutional rights.

79.     Each of the individual Defendants either engaged in the conduct described in this complaint, integrally participated in the conduct, ratified the conduct, or failed to intervene when a reasonable opportunity existed to do so.

## FIRST CLAIM FOR RELIEF
### MALICIOUS PROSECUTION – 42 U.S.C. 1983
**(Against Ramos, Cope, Randles, and Schreiber)**

80.     Mr. Biane re-alleges and incorporates by reference each allegation contained in the above paragraphs as though fully set forth herein.

81.     At all relevant times, Defendants Ramos, Cope, Randles, and Schreiber (collectively, the "Individual Defendants"), who referred to themselves as "Team Justice," were acting under color of law.

82.     As alleged above, the criminal investigation and the criminal prosecution of Mr. Biane were undertaken based on personal enmity, political opportunism, and the pursuit of partisan advantages. Mr. Biane was targeted because he had cast a lawful vote in favor of the Colonies settlement, which it was his every right to cast. While the political donation that provided the pretext for Mr. Biane's persecution was not actually made to Mr. Biane, Mr. Biane nevertheless has a right to receive political donations from his constituents. Under the circumstances set

forth above, the Individual Defendants targeted, investigated, and prosecuted an innocent person who was engaged in constitutionally protected activity.

83. Defendants Randles and Schreiber were the lead investigators for the Public Integrity Unit in the District Attorney's Office working under the supervision of Defendants Ramos and Cope throughout the criminal investigation and subsequent prosecution. Defendant Randles testified during the jury trial in 2017 that he believed that the settlement in the Colonies lawsuit was outrageous and egregious based solely upon the fact that the amount of the settlement was $102 million dollars. Defendant Randles' testimony left the distinct impression that he believed that criminal activity must have been involved in the settlement due to the dollar amount of the settlement. This testimony prompted the trial judge in the criminal jury trial in 2017 to ask Defendant Randles, while he was on the witness stand with the jury present, *when* Defendant Randles and the Public Integrity Unit began to suspect that something was amiss due to the dollar amount of the settlement. Defendant Randles admitted to the trial judge that his suspicions began in December of 2006, a few weeks after the $102-million dollar settlement was reached in November of 2006.

84. Defendant Randles testified at the criminal jury trial in 2017 that "I don't know a lot about the facts" of the Colonies civil litigation, and that he had never read the opinions of the judges who were involved in hearing the civil litigation. Defendant Randles had never read nor understood that the appraisal of the Colonies' land that had been taken by the County was over $100 million. Considering that the investigation was initiated because of the settlement, this was an admission that the Defendants' investigation was not a response to suspected criminal activity, but personal animosity and the desire for retribution.

85. The actions and the conduct of Ramos, Cope, Randles, and Schreiber caused Plaintiff Mr. Biane to be wrongfully prosecuted.

86.     The actions of Ramos, Cope, Randles, and Schreiber have resulted in the destruction of Mr. Biane's promising political career. He has lost business, professional, and political opportunities. He has suffered emotional distress. For six long years, he was mired in criminal litigation. He has incurred the cost of hiring lawyers. His name and reputation have been dragged through the mud. He seeks the full range of allowable remedies, including compensatory damages in every available category.

87.     The actions and the conduct of Ramos, Cope, Randles, and Schreiber was willful, wanton, malicious, retaliatory, and with reckless disregard for the rights of Mr. Biane and does therefore justify the imposition of exemplary and punitive damages as to each of them.

88.     Plaintiff brings this claim individually and seeks compensatory damages as well as attorney fees under 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF
## RETALIATION – 42 U.S.C. 1983
### (Against Ramos, Cope, Randles, and Schreiber)

89.     Mr. Biane re-alleges and incorporates by reference each allegation contained in the above paragraphs as though fully set forth herein.

90.     At all relevant times, Ramos, Cope, Randles, and Schreiber were acting under color of law.

91.     Mr. Biane's public endorsement of the settlement with Colonies, his criticism of the County's actions, his vote in favor of the Colonies settlement and his alleged receipt of political donations, together with all of his other actions relevant to this case, was constitutionally protected. Ramos, Cope, Randles, and Schreiber retaliated against Mr. Biane for exercising these rights in the manner described above.

92.     Among the many improper and wrongful motives of Defendants Ramos, Cope, Randles, and Schreiber was a desire to punish Mr. Biane for exercising his rights. This conduct was inextricably connected and bound up with the malicious investigation and prosecution of Plaintiff, as alleged above.

93.     As stated above, the actions of the Defendants have resulted in the destruction of Mr. Biane's promising political career. He has lost business, professional, and political opportunities. He has suffered emotional distress. For six long years, he was mired in criminal litigation. He has incurred the cost of hiring lawyers. His name and reputation have been dragged through the mud. He seeks the full range of allowable remedies, including compensatory damages in every available category.

94.     The actions and the conduct of the Defendants Ramos, Cope, Randles, and Schreiber was willful, wanton, malicious, retaliatory, and with reckless disregard for the Constitutional rights of Mr. Biane and does therefore justify the imposition of exemplary and punitive damages as to each of them.

95.     Plaintiff brings this claim individually and seeks compensatory damages as well as attorney fees under 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

### FABRICATION OF EVIDENCE – 42 U.S.C. 1983

### (Against Randles and Schreiber)

96.     Mr. Biane re-alleges and incorporates by reference each allegation contained in the above paragraphs as though fully set forth herein.

97.     At all relevant times, Defendants Randles and Schreiber were acting under color of law.

98.     Defendants Randles and Schreiber knew or reasonably should have known that Mr. Biane was innocent. Nevertheless, these two defendants conducted their investigation in a manner designed to convict an innocent person, including by eliciting false testimony and cobbling together material that would supposedly

COMPLAINT FOR DAMAGES

incriminate Mr. Biane and others. This "evidence" included without limitation the unreliable or false statements and testimony of Mr. Postmus, Mr. Aleman, Ms. Gonzales, and Defendant Randles.

99. Defendants Randles and Schreiber continued the criminal investigation of Mr. Biane even though they knew or reasonably should have known that Mr. Biane was innocent of all of the alleged criminal activity. Defendants Randles and Schreiber were intentionally indifferent to the innocence of Plaintiff Mr. Biane.

100. Defendants Randles and Schreiber used tactics that were coercive and abusive such that they knew, or were intentionally indifferent to, the fact that such tactics would produce false and inherently unreliable information and evidence, and that such information and evidence would be used to get an indictment against Mr. Biane. They also intentionally failed to verify the fabricated and unbelievable testimony of Ms. Gonzales, among others. This conduct was inextricably connected and bound up with the malicious targeting of Plaintiff, as alleged above.

101. As stated above, the actions of the Defendants have resulted in the destruction of Mr. Biane's promising political career. He has lost business, professional, and political opportunities. He has suffered emotional distress. For six long years, he was mired in criminal litigation. He has incurred the cost of hiring lawyers. His name and reputation have been dragged through the mud. He seeks the full range of allowable remedies, including compensatory damages in every available category.

102. The actions and the conduct of the Defendants Randles and Schreiber was willful, wanton, malicious, retaliatory, and with reckless disregard for the Constitutional rights of Mr. Biane and does therefore justify the imposition of exemplary and punitive damages as to each of them.

103. Plaintiff brings this claim individually and seeks compensatory damages as well as attorney fees under 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**

## MUNICIPAL LIABILITY – 42 U.S.C. 1983

### (Against Defendant County)

104.   Mr. Biane re-alleges and incorporates by reference each allegation contained in the above paragraphs as though fully set forth herein.

105.   When considered as the only evidence of a crime, the fact that an elected official received a political donation is not sufficient to support reasonable suspicion or probable cause. Nor is the fact that a settlement with a public entity is particularly large evidence that a crime has taken place.

106.   Under the framework that was invoked in Mr. Biane's prosecution, it was alleged that that the mere fact that a donation was made to a politician by a person who benefited from that politician's actions was sufficient to establish a crime. Mr. Biane contends that the use of this framework in connection with criminal investigations, incarcerations, and prosecutions constitutes an unconstitutional custom, policy, or practice. These flimsy allegations hid the true motive for the investigation, which was to punish Mr. Biane for his speech his vote, which embarrassed powerful factions within the County.

107.   Defendants knew or should have known that this rationale in Mr. Biane's case was unsound and that Mr. Biane was innocent. Defendants also knew or should have known that investigating an individual in retaliation for constitutionally-protected activity is unlawful. Nevertheless, the County continued to sanction and ratify the conduct of Defendants in this case.

108.   Mr. Biane further alleges that the County failed to adequately train and supervise Defendants. Here, Defendant Randles was assigned a case involving issues that were clearly above his level of education, training, knowledge, experience, and ability. His investigation method – which consisted in deducing from the large value of the settlement that criminal activity must have been afoot – clearly demonstrates that this case was above his head. Reasonable measures do not appear to have been taken to oversee the investigation or to ascertain whether

1  innocent people such as Mr. Biane were being unfairly targeted, especially given the

2  absence of any objective corroborating evidence pointing to Mr. Biane's guilt.

3        109.   The Defendants employed by the County do not appear to have been

4  disciplined, retrained, or terminated following the spectacular catastrophe of the

5  criminal trial and the acquittal of all of the targets of the campaign on all charges.

6  Instead, upon information and belief, the County has ratified and approved of all of

7  the actions taken by its employees in this case.

8        110.   The Defendant County permitted, maintained, and allowed, the

9  following conduct, without limitation:

10        A.    The District Attorney's Office for the County of San Bernardino

11  deployed public employees and resources in a politically-charged criminal

12  investigation without the regard for reliable and credible exculpatory evidence;

13        B.    The Defendant County's employees in the District Attorney's Office

14  conducted searches in furtherance of these criminal investigations, which were  used

15  to embarrass, punish, and harass;

16        C.    District Attorney's Office used its powers to target and punish free

17  speech and other conduct that is protected by the United States Constitution through

18  a wrongful criminal investigation and prosecution.

19        D.    The Public Integrity Unit of the District Attorney's Office employed

20  investigators who were dedicated to working on the Public Integrity Unit's

21  investigations, undermining the important checks and balances between the

22  investigators and the prosecutors;

23        E.    District Attorney's Office and other County employees pursued a

24  criminal investigation and prosecution that was intended to embarrass, punish, and

25  harass Mr. Biane and others for exercising their rights.

26        111.   At all relevant times, Defendant Ramos was an official with final

27  policymaking authority as it relates to the District Attorney's Office and the criminal

28  investigations that are undertaken and maintained by the District Attorney's Office.

1  The actions of the County Defendants as alleged herein were undertaken with the
2  willful, affirmative, and conscious approval of Mr. Ramos.

3  112.  For the reasons above, Plaintiff brings this additional claim for relief
4  against the County for (1) an unconstitutional custom and practice; (2) ratification;
5  and (3) inadequate supervision, a policy of inaction, and failure to train.

6  113.  As stated above, the actions of the Defendants have resulted in the
7  destruction of Mr. Biane's promising political career. He has lost business,
8  professional, and political opportunities. He has suffered emotional distress. For six
9  long years, he was mired in criminal litigation. He has incurred the cost of hiring
10 lawyers. His name and reputation have been dragged through the mud. He seeks the
11 full range of allowable remedies, including compensatory damages in every
12 available category.

13 114.  The actions and the conduct of the Defendants Ramos, Cope, Randles,
14 and Schreiber was willful, wanton, malicious, retaliatory, and with reckless
15 disregard for the Constitutional rights of Mr. Biane and does therefore justify the
16 imposition of exemplary and punitive damages as to each of them.

17 115.  Plaintiff brings this claim individually and seeks compensatory
18 damages as well as attorney fees under 42 U.S.C. § 1988.

19 **<u>FIFTH CLAIM FOR RELIEF</u>**
20 **<u>SUPERVISORY LIABILITY – 42 U.S.C. 1983</u>**
21 **(Against Ramos and Cope)**

22 116.  Mr. Biane re-alleges and incorporates by reference each allegation
23 contained in the above paragraphs as though fully set forth herein.

24 117.  On the basis of information and belief, and on the basis of the fact that
25 Defendant Ramos was the District Attorney for the County of San Bernardino at all
26 times relevant herein, Plaintiff alleges that the Defendant Ramos supervised
27 Defendants Cope, Randles, and Schreiber regarding their actions and their conduct
28 as alleged herein. As the District Attorney for the County of San Bernardino, and as

their supervisor, Defendant Ramos knew or should have known of the actions and omissions described above. Defendant Ramos did not take steps to prevent and to stop said action and conduct. The failure by Defendant Ramos to take the steps to prevent and to stop this conduct resulted in the deprivation of, and the interference with, the lawful exercise of the rights of Mr. Biane.

118.   Upon information and belief, Defendant Cope supervised the Defendants Randles and Schrieber with regard to their actions and conduct as alleged herein. Defendant Cope headed the "Public Integrity Unit" and directly observed Defendant Randles and Schrieber's coercive and illegitimate techniques. In this capacity, Defendant Cope knew or should have known of the actions and omissions described above. Defendant Cope did not take steps to prevent and to stop said action and conduct. The failure by Defendant Cope to take the steps to prevent and to stop this conduct resulted in the deprivation of, and the interference with, the lawful exercise of the rights of Mr. Biane.

119.   The Defendant's supervisorial conduct as alleged herein was so closely related and connected to the deprivation of the rights of Mr. Biane under the United States Constitution as to be the moving force that caused the resulting injuries to Mr. Biane. Each of the Individual Defendants was acting under the color of law.

120.   As stated above, the actions of the Defendants have resulted in the destruction of Mr. Biane's promising political career. He has lost business, professional, and political opportunities. He has suffered emotional distress. For six long years, he was mired in criminal litigation. He has incurred the cost of hiring lawyers. His name and reputation have been dragged through the mud. He seeks the full range of allowable remedies, including compensatory damages in every available category.

121.   The actions and the conduct of the Defendants Ramos, Cope, Randles, and Schreiber was willful, wanton, malicious, retaliatory, and with reckless

1  disregard for the Constitutional rights of Mr. Biane and does therefore justify the

2  imposition of exemplary and punitive damages as to each of them.

3      122.   Plaintiff brings this claim individually and seeks compensatory

4  damages as well as attorney fees under 42 U.S.C. § 1988.

5  ### SIXTH CLAIM FOR RELIEF

6  ### CONSPIRACY – 42 U.S.C. 1983

7  **(Against Against Ramos, Cope, Randles, and Schreiber)**

8      123.   Mr. Biane re-alleges and incorporates by reference each allegation

9  contained in the above paragraphs as though fully set forth herein.

10      124.   Ramos, Cope, Randles, and Schreiber formed a combination of two or

11  more persons acting in concert to commit the individual acts described in this

12  complaint, the primary and principal element and objective was the agreement

13  amongst among them to retaliate against, damage, and prosecute Mr. Biane and

14  others for exercising their lawful rights.

15      125.   Ramos, Cope, Randles, and Schreiber conspired, combined, colluded,

16  and/or agreed to act in concert to wrongfully initiate and pursue the criminal

17  investigation of Mr. Biane and others, and to obtain indictments against them, and to

18  prosecute them for multiple serious felony crimes in a lengthy criminal jury trial.

19  This conspiracy was bound up with numerous wrongful motives, including political

20  opportunism, private advantage, personal enmity, and retaliation against Mr. Biane

21  and others for exercising their rights. The Defendants performed overt acts in

22  furtherance of the conspiracy as alleged herein.

23      126.   The Defendants' conspiracy was the proximate cause of the campaign

24  against Mr. Biane and the deprivation of his rights.

25      127.   As stated above, the actions of the Defendants have resulted in the

26  destruction of Mr. Biane's promising political career. He has lost business,

27  professional, and political opportunities. He has suffered emotional distress. For six

28  long years, he was mired in criminal litigation. He has incurred the cost of hiring

COMPLAINT FOR DAMAGES

lawyers. His name and reputation have been dragged through the mud. He seeks the full range of allowable remedies, including compensatory damages in every available category.

128.   The actions and the conduct of the Defendants Ramos, Cope, Randles, and Schreiber was willful, wanton, malicious, retaliatory, and with reckless disregard for the constitutional rights of Mr. Biane and does therefore justify the imposition of exemplary and punitive damages as to each of them.

129.   Plaintiff brings this claim individually and seeks compensatory damages as well as attorney fees under 42 U.S.C. § 1988.

COMPLAINT FOR DAMAGES

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and requests entry of judgment in his favor and against all defendants as follows:

A.    General and compensatory damages in an amount according to proof;

B.    Special damages in an amount according to proof;

C.    Exemplary and punitive damages against Ramos, Cope, Randles, and Schreiber, in an amount according to proof;

D.    Costs of suit;

E.    Attorney fees under 42 U.S.C. § 1988; and

F.    Such other relief as may be warranted or as is just and proper.


DATED:  October 15, 2018        LAW OFFICES OF DALE K. GALIPO


By_____*/s/ Dale K. Galipo*_____
        Dale K. Galipo
        Attorney for Plaintiff

COMPLAINT FOR DAMAGES

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


DATED:  October 15, 2018          LAW OFFICES OF DALE K. GALIPO


By _____*/s/ Dale K. Galipo*_____
Dale K. Galipo
Attorney for Plaintiff